## COLVARD v. BLACK et al.

1. To write and publish of another that he is a liar is libelous, and gives to the person thus charged a right of action.
2. Though from the language employed in a publication there is uncertainty both as to whether there was an intention to make a charge of a libelous nature, and also as to whether, such being the purpose, the design was to apply this charge to a particular person, yet, if the language was in fact used with such an intention and design, that person may bring an action for a libel and maintain it by proper proof. It is not, in such a case, essential that all of the public should understand the true intent and meaning of the defamatory matter. If it is on its face of that character, or susceptible of being so interpreted, and if those knowing the plaintiff are aware of the intention to make the libelous charge and apply it to the plaintiff, this is sufficient.

3. An amendment which sought to add to a petition legally setting forth a cause of action for a libel, by declaring upon another and distinct publication alleged to have been libelous, was properly rejected. If the matter sought to be set up by such an amendment was of itself actionable, it embraced a new and distinct cause of action, and was therefore not allowable. If it was not, rejecting it was, of course, proper.

Argued March 15,—Decided May 12, 1900.

Action for libel. Before Judge Fite. Whitfield superior court. April term, 1899.

*William E. Mann,* for plaintiff.
*Shumate & Maddox,* for defendants.

LITTLE, J. 1. Colvard instituted an action against Black, Shaver, and Bogle, to recover damages for libel. The petition alleges that the defendants falsely and maliciously did publish of and concerning him in the "Dalton Argus," on the 19th and 20th days of August, 1898, the following false, malicious, and insinuating language, to wit:

"A DIRTY LIE NAILED.

"Georgia, Whitfield County. Ordinary's Office, August 18th, 1898.

"The following is a correct statement of the articles found on the body of an unknown man killed on the Western & Atlantic railroad about one mile north of Tilton, Ga., on March 12th, 1897, and turned over to me by W. A. Black, Coroner, viz.: One German Testament, two vials medicine, one box Tutt's pills (7 pills), two spools thread, two pairs eyeglasses, one pair spectacles, one pocket-knife, and twenty-one dollars and fifty cents in cash ($21.50). All the articles named above (except the money) are still in the Ordinary's Office. There was not the slightest clue, so far as I could discover, as to the identity or place of residence of the deceased, therefore it was thought to be the best way to dispose of the money by using it to pay for his decent burial, and for the legal cost of the inquest as far as it would go. It was paid out by me as follows: For coffin and burial expenses to W. F. Brown, $10.00; the contract for this was very promptly made by Mr. Black in his official capacity as Coroner, and I hold Mr. Brown's receipt for the money. For Coroner's official and legal fee for holding inquest $10.00, thus

saving the County Treasurer that amount.   The remaining
$1.50 was used by me to buy postage-stamps for use in the public
business of the county.   Not one cent of the money was used or
appropriated for private purposes by Mr. Black or by any one
else.   He turned it all over to me, and if it was paid out im-
properly then I am alone to blame.

[Signed] Jos. Bogle, Ordinary.

" P. S.   I acquainted Mr. Colvard with all the facts as stated
above, something like thirty days ago.

[Signed] Jos. Bogle, Ordinary."

It was alleged that the Dalton Argus was a newspaper pub-
lished and largely circulated in Whitfield county, Georgia, and
that the article did, in effect, accuse petitioner of wilfully lying,
and was prepared and published for the purpose of exposing
him to public hatred, contempt, and ridicule, to cause his defeat
for the legislature, and that said article did cause such defeat.
It is further alleged that the article injured his business and
left the impression that he was a wilful liar and unworthy of
the confidence of the public; that defendants knew what impres-
sion the said article would make and that it would damage peti-
tioner; that it was false and malicious.

By leave of the court, the petition was amended by adding,
that petitioner was at the time of the publication engaged in the
business of manufacturing and sale of monuments in the city of
Dalton, and dealing directly with the public.   The plaintiff also
offered to amend by adding the following, which the court re-
fused to allow.   On the 26th day of August, 1898, in a card
which was published in the Dalton Argus on the 3d day of Sep-
tember of said year, the said John Black, in seeking to exonerate
and relieve his codefendants from responsibility and liability
for their co-operation in writing and publishing the card falsely
and maliciously connecting petitioner with the report therein
mentioned, assumes all of the responsibility, and, in assuming
the responsibility, says:   " So much has been said about the
card from Judge Bogle which appeared in the Dalton Argus
of August 20th, I desire to make a word of explanation.   The
statement of facts was furnished by Judge Bogle from the
records of his office by request of my son, W. A. Black, to refute

a damaging, vile lie that was being circulated against my son. Judge Bogle furnished facts only, and did not know it was to be published until he saw it in print. Originally the statement had no postscript and the postscript was added by my request. The report of the circulation of the lie came in too fast just on the eve of election to be contradicted by personal visits, and I decided it best to have the statement published, and I assume all responsibility. The heading 'A Dirty Lie Nailed' was written for me by the editor of the Argus, submitted to and approved by me, because we all knew that report to be one of the dirtiest of all lies." And further in said card, said Black says: "Both my son and myself had reports of the repeated circulation of the lie as it was being industriously used in Mr. Colvard's interest. I naturally presumed that it was at Mr. Colvard's instigation." The petition as amended was demurred to on the ground that it set out no cause of action; that there is nothing slanderous in the publication, and nothing to connect the plaintiff with the publication of having told a lie. The demurrer was very general in its terms, and seems to have been directed entirely to the point, that, as alleged to have been made, the publication did not charge any one with being a liar, nor refer at all to the plaintiff. While the petition seems not to have been drawn with any great degree of care, and, in charging that the words used were libelous and intended to apply to the plaintiff, was wanting in much of the force and effect which could have been supplied by a proper innuendo, and the petition might, therefore, have been found defective on special demurrer, yet, against the general demurrer filed, it must be held that the petition was sufficient to carry the case to the jury. After argument, the court sustained the demurrer and dismissed the petition. To this ruling the plaintiff excepted. The errors assigned are, the refusal to allow the offered amendment, and the ruling sustaining the demurrer.

A libel is defined by our Civil Code, § 3832, to be a false and malicious defamation which is expressed in print, writing, or signs, which tends to injure the reputation of an individual and expose him to public hatred, contempt, or ridicule. It is urged, however, that the printed words which are set out in the state-

ment of the case above, do not import a crime or misdemeanor and are not actionable per se, and to call a man a liar is not actionable. In all actions instituted to recover damages for libel, the jury are to determine whether the words declared on are libelous or not. *Beazley* v. *Reid,* 68 *Ga.* 380. It is gravely urged that to write and publish of a man that he is a liar is not actionable at all. It is difficult for us to imagine what words would more fully expose a man to public contempt than to publish him as being a liar. Mr. Townshend in his treatise on Slander and Libel, § 177, declares that it is actionable to charge one *in writing* with being a villain, liar, rogue, rascal, or swindler, etc. See also 8 Johns. 356; 33 How. Pr. Rep. 180; 24 Wend. 434; 27 Conn. 58. In the case of Hake *v.* Brames, the Supreme Court of Indiana was called on to say whether a letter couched in the following language: " I was unfortunate enough to have him [plaintiff] in my employ at one time as a bookkeeper. He is a liar. I would not believe him under oath," was libelous. On demurrer to the complaint it was held that each of the three sentences in the letter was libelous. 95 Ind. 161. The authorities cited, which construe a publication characterizing another as a liar to be libelous and actionable, were based on a definition of libel similar to that found in our Civil Code.

2. It is, however, further urged that from the indefinite character of the publication, not stating what the lie was or who told it, the defendants could neither justify nor deny, that they could make no defense to allegations so indefinite. Whether the publication did in fact charge the plaintiff with having told a lie, and whether there was anything libelous of Colvard, or whether anybody was branded as a liar, were questions of fact for the jury to determine; and whatever charge the publication did contain, the defendants, if they desired to plead justification, could allege to be true, thus forming an issue. *Park* v. *Piedmont Insurance Co.,* 51 *Ga.* 510. Words which on their face appear to be entirely harmless may, under certain circumstances, convey a covert meaning wholly different from the ordinary and natural interpretation usually put upon them. In his petition the plaintiff says that the words published do, in effect, accuse him of wilful lying, and that they were gotten up·

and published for the purpose of exposing him to public hatred, contempt, and ridicule, that the defendants knew the impression that said article would make, and that the words used were false and malicious and would damage petitioner. If these allegations were true, the plaintiff was entitled to go to the jury. The rule is, that he may give in evidence any of the attending circumstances, the cause and occasion of the publication, and all other extraneous matters which will tend to explain the allusion or point out the person in question, all the surrounding circumstances, the facts connected with the transaction, and from this evidence it is for the jury to say who was meant. Newell on Slander and Libel, 767, and authorities cited in note 1. The same author, basing the principle enunciated on authority, says, on page 768, that it is not necessary that all the world should understand the defamatory matter. It is sufficient if those who know the plaintiff can make out that he was the person meant. See also *Tillman* v. *Willis,* 61 *Ga.* 433; *Hardy* v. *Williamson,* 86 *Ga.* 551.

3. It is also complained that the court erred in refusing an amendment offered to the petition by the plaintiff, by which amendment the plaintiff sought to incorporate in his petition another card published in the Dalton Argus by one of the defendants. This card purported to be an assumption by one of the defendants of all the responsibility for the original publication, and was explanatory of the first. We are of the opinion that the court did not err in refusing to allow this amendment. As we have ruled, the original petition of itself was sufficient to carry the case to the jury. It alleged a distinct publication, which, if malicious and intended to charge the plaintiff with lying, needed no amendment. Had another publication made at a different time been proved and shown to be libelous, another and a distinct cause of action would have been added; and this is not allowable. The second publication, whether libelous or not, could, when proved, have been introduced in evidence on the trial of the case; and this is true whether the second publication was made before or after that for which the suit was instituted, or even after the commencement of the action, the object of the evidence being to show the animus of the defendant.

But if the second publication did not contain words which were libelous, it could not have added anything to the original cause of action. If the words it contained were libelous, then, as they constituted another cause, they could not be engrafted on the first.

It is our conclusion that the court erred in sustaining the demurrer and dismissing the petition. In our opinion the plaintiff was entitled, under the allegations which he made, to have his case passed upon by a jury, who were authorized to finally determine whether or not the defendants falsely and maliciously defamed the plaintiff in writing in such a manner as tended to injure his reputation and to expose him to public hatred or contempt.

*Judgment reversed. All concurring, except Fish, J., absent.*